**2013-1316, -1317**
**(Reexamination No. 95/001,320)**

# United States Court of Appeals
# for the Federal Circuit

———————————

K-SWISS INC.,

*Appellant*,

*v.*

GLIDE'N LOCK GMBH (now known as On Clouds GmbH),

*Cross-Appellant*.

*Appeals from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board.*

## BRIEF FOR APPELLEE/CROSS-APPELLANT
## GLIDE'N LOCK GMBH, now known as On Clouds GmbH

Henry A. Petri, Jr.
Michael W. O'Neill
Daniel P. Mullarkey
NOVAK DRUCE CONNOLLY BOVE
   + QUIGG LLP
1875 Eye Street, NW
Eleventh Floor
Washington, DC 20006
(202) 331-7111

*Attorneys for Appellee/Cross-Appellant*
Glide'n Lock GmbH, nka On Clouds GmbH

AUGUST 26, 2013

## CERTIFICATE OF INTEREST

Counsel for Cross-Appellant On Clouds GmbH (formerly named Glide'n Lock GmbH) certifies the following:

1.      The full name of every party or amicus represented by me is:

<u>On Clouds GmbH (formerly named Glide'n Lock GmbH)</u>

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

<u>On Clouds GmbH (formerly named Glide'n Lock GmbH)</u>

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Henry A. Petri., Jr,  Gregory V. Novak, Michael W. O'Neill, Daniel P. Mullarkey,

NOVAK DRUCE CONNOLLY BOVE + QUIGG, LLP


Jacob Snodgrass, Robert Gaybrick, Jeremy Peterson, Nicolas Kim

MORGAN LEWIS & BOCKIUS LLP

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ...................................................................v

TABLE OF ABBREVIATIONS ............................................................ viii

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF JURISDICTION.........................................................1

I.      STATEMENT OF THE ISSUES ...................................................2

II.     STATEMENT OF THE CASE .......................................................5

III.    STATEMENT OF THE FACTS .....................................................8

        A.    The '866 Patent ...............................................................8

              1.    The '866 Patent Claims ........................................9

              2.    The Problems The '866 Patent Inventor Recognized With Known Athletic Shoes ..............................................11

              3.    The Inventor's Solution .......................................14

              4.    The Pertinent Claim Limitations .....................17

        B.    Overview of the Cited References....................................18

              1.    Okabe ....................................................................18

              2.    Szentes .................................................................22

              3.    Pagani, Takahashi, and Inohara ........................24

IV.     SUMMARY OF THE ARGUMENT .............................................26

V.      ARGUMENT.................................................................................29

        A.    Standard of Review..........................................................29

              1.    This Court May Reverse The Board's Decision Regarding The Anticipation Rejections If The Rejections Are Unsupported By Substantial Evidence ..............................................29

2.  Claim Construction Is Reviewed de Novo ....................................29

3.  The Board's Ultimate Conclusion Of Obviousness Is Reviewed de Novo, But The Underlying Factual Findings Are Reviewed For Substantial Evidence ......................................................................30

B.  The Board Erred In Affirming The Examiner's Rejection Of Claims 1-5, 9, And 10 As Anticipated By Okabe ......................................31

1.  Okabe Has No Express Disclosure That In A First Configuration, There Is Relative Motion In A Longitudinal Direction Between An Upper Portion And A Lower Portion Of A Resilient Member......31

2.  Even Assuming Okabe Describes Relative Motion In A Longitudinal Direction, Okabe Has No Disclosure That In A Second Configuration Where The Inner Surfaces Of The Upper And Lower Portions Are Engaged, Relative Motion Between The Upper And Lower Portions Is Substantially Prevented ................33

3.  The Board's Reliance On The Term "Substantial" Disregards The '866 Patent Specification And Okabe's Description Of Its Rubber Pins ........................................................................................36

4.  The Board's Finding Of Anticipation By Okabe Is Unsupported By Substantial Evidence ......................................................................40

C.  The Board Erred In Affirming The Examiner's Rejection Of Claims 1, 2, And 8-10 As Anticipated By Szentes ....................................41

1.  Szentes Has No Disclosure That In A First Configuration, There Is Relative Motion In A Longitudinal Direction Between An Upper Portion And A Lower Portion Of A Resilient Member................41

2.  The Board's Rationale For Anticipation Is Not Supported By Substantial Evidence ......................................................................43

3.  Substantial Evidence Does Not Support The Board's Finding That Claim 8 Is Anticipated by Szentes ................................................46

D.  The Board Correctly Reversed the Examiner's Obviousness Rejections ........................................................................................50

1.    Substantial Evidence Supports The Board's Findings And Conclusions Of Law That Claims 1-11 Are Not Obvious Over Pagani In View Of Szentes ............................................................50

2.    Substantial Evidence Supports The Board's Findings And Conclusions Of Law That Claims 1-11 Are Not Obvious Over Takahashi In View Of Szentes......................................................62

3.    Substantial Evidence Supports The Board's Findings And Conclusions Of Law That Claims 1-11 Are Not Obvious Over Inohara In View Of Szentes..........................................................62

E.    The Board Properly Found That The Examiner's Rejection Of Claim 8 Based On Okabe Was Erroneous ................................................63

F.    The Board Properly Found That The Examiner's Anticipation Rejection Of Claim 11 Based On Okabe Was Erroneous .............67

VI.    CONCLUSION...............................................................................68

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Akamai Techs., Inc. v. Cable & Wireless Internet Serv., Inc.*,
  344 F.3d 1186 (Fed. Cir. 2003) ..........................................................48

*Brand v. Miller*,
  487 F.3d 862 (Fed. Cir. 2007)............................................................29

*Cohesive Tech. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008) ..........................................................52

*Continental Can Co. v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991) ..........................................................48

*Gechter v. Davidson*,
  116 F.3d 1454 (Fed. Cir. 1997) ..........................................................29

*Hansgirg v. Kemmer*,
  102 F.2d 212 (CCPA 1939) ................................................................49

*Hoover Co. v. Royal Appliance Mfg. Co.*,
  238 F.3d 1357 (Fed. Cir. 2001) ............................................. 30, 54, 55

*In re Am. Acad. of Sci. Tech. Ctr.*,
  367 F.3d 1359 (Fed. Cir. 2004) ..........................................................57

*In re Baker Hughes Inc.*,
  215 F.3d 1297 (Fed. Cir. 2000) ..........................................................29

*In re Baxter Travenol Labs.*,
  952 F.2d 388 (Fed. Cir. 1991)............................................................29

*In re De Blauwe*,
  736 F.2d 699 (Fed. Cir. 1984)............................................................59

*In re Fracalossi and Wajer*,
  681 F.2d 792 (CCPA 1982) ......................................................... 51, 57

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ...........................................................29

*In re ICON Health & Fitness, Inc.*,
    496 F.3d 1374 (Fed. Cir. 2007) ...........................................................30

*In re Jolley*,
    308 F.3d 1317 (Fed. Cir. 2002) ................................................. 30, 54

*In re NTP, Inc.*,
    654 F.3d 1279 (Fed. Cir. 2011) ...........................................................30

*In re Oelrich*,
    666 F.2d 578 (CCPA 1981) ..................................................................49

*In re Pearson*,
    494 F.2d 1399 (CCPA 1974) ................................................................59

*In re Robertson*,
    169 F.3d 743 (Fed. Cir. 1999)..............................................................49

*In re Schulze*,
    346 F.2d 600 (CCPA 1965) ..................................................................59

*In re Watts*,
    354 F.3d 1362 (Fed. Cir. 2004) ...........................................................56

*In re Yamamoto*,
    740 F.2d 1569 (Fed. Cir. 1984) ...........................................................30

*Medichem, S.A. v. Rolabo, S.L.*,
    353 F.3d 928 (Fed. Cir. 2003)..............................................................57

*Meitzner v. Mindick*,
    549 F.2d 775 (CCPA 1977) ..................................................................59

*Mendenhall v. Cedarapids, Inc.*,
    5. F.3d 1557 (Fed. Cir. 1993)...............................................................52

*Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*,
    73 F.3d 1085 (Fed. Cir. 1995)..............................................................29

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................................................30

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
    927 F.2d 1565 (Fed. Cir. 1991) ...........................................................................48

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
    295 F.3d 1292 (Fed. Cir. 2002) ...........................................................................49

*Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*,
    814 F.2d 628 (Fed. Cir. 1987)...........................................................................48

## **TABLE OF ABBREVIATIONS**

'866 Patent            On Clouds' U.S. Patent No. 7,181,866 (JA01698-01705)

Board                  United States Patent and Trademark Office, Patent Trial and
                       Appeal Board

ACP                    The Action Closing Prosecution issued by the Examiner, dated
                       October 29, 2010

RAN                    The Right of Appeal Notice issued by the Examiner, dated
                       April 24, 2011

Okabe                  English Translation of Japanese Patent Application Publication
                       No. JP H07-284403 naming Okabe as inventor (JA01749-
                       01752)

Szentes                International Published Application No. WO 90/00021 naming
                       Szentes et al. as inventor (JA01727-01748)

Pagani                 UK Patent Application GB 2 001 843 A naming Pagani et al. as
                       inventor

Takahashi              English Translation of Japanese Unexamined Utility Model
                       Application S49-96158

Inohara                U.S. Patent No. 4,523,393, issued to Inohara, on June 18, 1985

PTO                    United States Patent and Trademark Office

JA__                   Page in Joint Appendix

JA__(xx:yy-zz)         Joint Appendix page where xx represents a column number of a
                       patent, yy represents the initial line of cited text and zz
                       represents the ending line of cited text

**NOTE:**  All emphases in the brief have been added unless otherwise noted.

## STATEMENT OF RELATED CASES

On Clouds is unaware of any other appeals or petitions taken in this reexamination proceeding.

## STATEMENT OF JURISDICTION

This is an appeal from a final Board decision of an *inter partes* reexamination proceeding dated December 28, 2012. 37 C.F.R. §1.983(a). K-Swiss timely filed a Notice of Appeal on February 26, 2013. 37 C.F.R. §1.983(b). On Clouds timely filed a Notice of Cross-Appeal on March 12, 2013, 37 C.F.R. §1.983(d), which was consolidated with the instant appeal. This Court has jurisdiction pursuant to 35 U.S.C. §141 and 28 U.S.C. §1295(a)(4).

I.    **STATEMENT OF THE ISSUES**

The inventor of On Clouds' '866 Patent recognized that a runner's foot experiences a variety of stresses while running. Not only are there vertical stresses perpendicular to the ground due to the foot hitting the ground, there are also stresses at oblique angles due, for example, to the runner's forward motion.

The '866 Patent inventor set out to design a shoe outsole that would absorb shoe loads occurring both in the vertical direction and at oblique angles by creating an outsole that could deform in both perpendicular (compression) and tangential (shearing) directions.

The '866 Patent inventor realized, however, that allowing deformation in the tangential direction could cause problems for a runner. During the act of running, the tangential stresses on the shoe ***reverse direction***:  When a runner's foot lands, the stresses are in the forward direction, but when the runner pushes off, the stresses are in the reverse direction. The '866 Patent inventor recognized that if an outsole deformed in a tangential direction when a runner's foot lands, it could deform in the opposite tangential direction when the runner pushed off. The '866 Patent called this a "floating effect," which causes the runner to experience instability, and would cause the runner to lose distance with each step because the shoe sole would have to initially deform in the opposite direction when the runner pushes off.

2

The '866 Patent overcomes those deficiencies by describing and claiming a shoe outsole that is configured to ***allow*** the upper and lower portions of the outsole to move relative to each other in the longitudinal direction so as to elastically absorb oblique shoe loads ***and*** that is configured so that the inner surface of the upper portion engages with the inner surface of the lower portion so as to substantially ***prevent*** relative motion in the longitudinal direction between the upper and lower portions once the upper portion is engaged with the lower portion.

As explained in detail below, none of the prior art references applied by the Board or cited by K-Swiss describes or suggests an outsole configured ***both*** to allow relative movement between the upper and lower portions of the outsole so as to elastically absorb oblique shoe loads ***and*** to engage the inner surfaces of the upper and lower portions so as to prevent relative movement between the upper and lower portions.

The Board's decision affirmed certain of the Examiner's anticipation rejections while reversing some of the anticipation rejections of dependent claims and reversed the Examiner's obviousness rejections. K-Swiss filed the first notice of appeal, directed to the reversal of the Examiner's rejections, while On Clouds filed the notice of cross-appeal directed to the anticipation rejections. Therefore, On Clouds submits that the issues to be decided by this appeal are:

1.      Whether the Board erred in affirming the Examiner's rejection of claims 1-5, 9, and 10 as anticipated by Okabe, where the elastic deformation described in Okabe, even if assumed to be in the longitudinal direction, would result in relative movement between the upper and lower portions of the outsole, thus not meeting the claim limitation "the engagement substantially preventing relative motion in the longitudinal direction."

2.      Whether the Board erred in affirming the Examiner's rejection of claims 1, 2, and 8-10 as anticipated by Szentes, where (1) Szentes is silent as to whether its outsole is configured to absorb shoe loads oblique to the perpendicular direction "by relative motion in the longitudinal direction between the upper portion and the lower portion," and all of Szentes's disclosure is directed to *avoiding* such relative motion, and (2) as to claim 8, Szentes has no description of "positive engagement" between the upper and lower portions, and such "positive engagement" is not inherent in Szentes's description.

3.      Whether substantial evidence supports the Board's conclusion that claims 1-11 would not have been rendered obvious over Pagani, Takahashi, or Inohara in view of Szentes where the Board properly found that the proposed combinations were merely the result of impermissible hindsight reconstruction.

4.      Whether the Board correctly construed "positive engagement" in light of the specification in determining that claim 8 was not anticipated by Okabe.

4

5.     Whether the Board correctly found that claim 11 was not anticipated by Okabe in view of the description in the specification.

## II.     STATEMENT OF THE CASE

This appeal is from the Board's decision in *Inter Partes* Reexamination Control No. 95/001,320, involving On Clouds' U.S. Patent No. 7,181,866, entitled "Outsole."  The '866 Patent issued on Feb. 27, 2007, and is directed to an outsole for athletic shoes that can be elastically deformed in a tangential direction, *i.e.*, in a direction parallel to the plane of the outer surface of the outsole.

K-Swiss requested *inter partes* reexamination of the '866 Patent. The K-Swiss reexamination request proposed the following rejections: (1) each of claims 1-10 as anticipated by Okabe (JA01518); (2) claims 1, 2 and 6-10 as anticipated by Szentes (JA01527); and (3) claims 1-10 as obvious over Pagani in combination with Szentes and Okabe (JA01534); (4) claims 1-10 as obvious over Sedelmeier in combination with Okabe and Inohara (JA01550); (5) claims 1-10 as obvious over Takahashi in combination with Szentes (JA01564); and (6) claims 1-10 as obvious over Inohara in combination with Szentes (JA01582).

The PTO determined that there was a substantial new question of patentability raised with respect to each of the references submitted by K-Swiss (JA01427-01442), and the Examiner concurrently issued an Office Action. In the Office Action, the Examiner adopted most of the rejections proposed by K-Swiss,

with certain modifications. Nevertheless, the Examiner did *not* adopt the proposed rejection of claims 6 and 7 as anticipated by either Okabe or Szentes, finding that neither Okabe nor Szentes disclosed the elastic deformation of their respective resilient members, and the specific percentages set out in claims 6 and 7 were not inherent in either Okabe or Szentes. (JA01450-01452). Likewise, the Examiner did *not* adopt the proposed obviousness rejection involving Sedelmeier. (JA01455-01456). The Patent Owner submitted a response to the Office Action, adding new dependent claim 11, and K-Swiss submitted Third Party Requester Comments, including proposed rejections as to new claim 11.

The Examiner considered the parties submissions, and issued an Action Closing Prosecution, making the same rejections as in the first Office Action, and again not adopting the proposed rejections of claims 6 and 7 as anticipated or the obviousness rejection based on Sedelmeier. (JA00781-00784; JA00786-00787). The ACP also adopted the proposed rejections regarding new claim 11. (JA00791-00794).

Following further submissions by the parties, the Examiner issued the Right of Appeal Notice dated April 24, 2011, making the following rejections:

1.  Claims 1-5 and 8-11 as anticipated by Okabe (JA00672-00673; JA00683);

2.  Claims 1, 2, and 8-10 as anticipated by Szentes (JA00673-00674);

3.    Claims 1-11 as obvious over Pagani in view of Szentes (JA00675-00676; JA00683);

4.    Claims 1-11 as obvious over Takahashi in view of Szentes (JA00678-00680; JA00683-00684);

5.    Claims 1-11 as obvious over Inohara in view of Szentes (JA00680-00682; JA00684); and

6.    Claim 11 as indefinite (JA00682).

As in the ACP, the Examiner in the RAN did *not* adopt the proposed rejections of claims 6 and 7 as anticipated by Okabe or Szentes and did *not* adopt the proposed Sedelmeier rejection. (JA00672-00674; JA00677-78).

On Clouds appealed the Examiner's rejections to the Board. Notably, K-Swiss did not appeal the Examiner's decision not to adopt the proposed rejections of claims 6 and 7 as anticipated by either Okabe or Szentes.

In its Decision dated December 28, 2012, the Board *affirmed* the Examiner's rejection of claims 1-5, 9, and 10 as anticipated by Okabe, but *reversed* the Examiner's rejection of claims 8 and 11 as anticipated by Okabe. (JA00493). The Board also *affirmed* the Examiner's rejection of claims 1, 2, and 8-10 as anticipated by Szentes. (*Id.*)   The Board *reversed* the Examiner's obviousness rejections and the rejection of claim 11 as indefinite. (*Id.*)

7

Because dependent claims 6 and 7 were subject only to obviousness rejections in the RAN, and because K-Swiss did not appeal the Examiner's decision not to adopt its proposed rejection of claims 6 and 7 as anticipated by either Okabe or Szentes, the Board's reversal of the obviousness rejections had the result of confirming claims 6 and 7 as patentable. K-Swiss's appeal and On Clouds' appeal followed.

## III.  STATEMENT OF THE FACTS

### A. The '866 Patent

On Clouds' '866 Patent is generally directed to an outsole for athletic shoes. (JA01703(1:5-6)). As described in more detail below, the outsole is configured such that it is elastically deformable in the tangential direction (that is, parallel to the plane of the outer surface of the outsole) to absorb shoe loads that are oblique to the perpendicular direction. (JA01703(1:5-11)). At the same time, the outsole is configured to avoid what the patent calls a "floating effect," where relative movement between the various parts of the outsole causes instability for the runner and potential loss of distance with each step. (JA01704(3:41-44)). Figure 1 of the '866 Patent is reproduced below.



## 1.  The '866 Patent Claims

Claims 1-11 are all at issue in this appeal. Independent claim 1 recites (with pertinent portions highlighted, and including line breaks and indentations for clarity):

> 1. An outsole for a shoe, the shoe disposed along a longitudinal axis in a longitudinal direction parallel to a ground surface in use, the outsole comprising:
>
> > *a resilient member having* an inner surface, an outer surface and, with respect to a direction perpendicular to the longitudinal direction, *an upper portion and a lower portion, the outer surface of the lower portion proximate the ground surface in use,*

9

the resilient member having first and second configurations, the first configuration having the inner surface of the upper portion spaced from the inner surface of the lower portion, *the resilient member elastically absorbs shoe loads oblique to the perpendicular direction by relative motion in the longitudinal direction between the upper portion and the lower portion in the first configuration*,

*the second configuration having the inner surface of the upper portion engaged with the inner surface of the lower portion* due to absorbed shoe loads, *the engagement substantially preventing relative motion in the longitudinal direction between the upper portion and the lower portion*.

(JA01705(6:1-21). Independent claim 9 has limitations similar limitations to those highlighted above. (*See* JA01705(6:40-62)).

Dependent claims 6 and 7 recite that the resilient member is elastically deformed by more than 20% or 50%, respectively, in the second configuration. (JA01705(6:33-38)).

Claim 8 recites:

8. The outsole according to claim 1, wherein the engagement *comprises positive engagement*.

(JA01705(6:38-39)).

Claim 11, added during the reexamination, depends indirectly from independent claim 1 and recites that the "resilient member comprises a profile like hollow element that contains a tubular part." (*See* JA00461).

## 2. The Problems The '866 Patent Inventor Recognized With Known Athletic Shoes

The '866 Patent inventor recognized that shoes having elastically resilient outsoles were known. (JA01703(1:22-24)). According to the '866 Patent, embedded gel or air cushions "are intended to elastically absorb the shocks that occur while running" and thus protect the joints of the runner while providing a comfortable running experience. (JA01703(1:23-27)).

The '866 Patent inventor realized, however, that there were at least two problems with the known elastically resilient outsoles. As the inventor recognized, most athletic shoes available on the market have spring characteristics that primarily "provide a spring effect in the vertical direction or in the direction perpendicular to the running surface." (JA01703(1:28-31)). This spring effect takes the form of compression of the shoe's sole. (JA01703(1:31-32)). Those outsoles, however, "are relatively rigid in the horizontal or tangential direction and do not yield sufficiently if the runner's foot contacts the ground obliquely and with a slight propulsive force." (JA01703(1:32-35)).

Figure 1b of the '866 Patent illustrates this problem (along with the inventor's solution):



Fig 1b)

According to the '866 Patent, the load on the shoe is not simply vertical, but also may be in the direction of arrow P1 in Figure 1(b) if there is a transversely forward load when the shoe contacts the ground. (JA01704(3:29-31); JA01705(5:65)). As the '866 Patent inventor recognized, existing shoes that were elastic only in the vertical or perpendicular direction do not "yield sufficiently if the runner's foot contacts the ground obliquely and with a slight propulsive force" (JA01703(1:33-35)), such as with the load indicated by arrow P1 in Figure 1(b).

The reason known shoes that were elastic in only the vertical or perpendicular direction were rigid in the horizontal or tangential direction relates to the second problem with the existing athletic shoes. The '866 Patent inventor recognized that the available athletic shoes had to have rigidity in the horizontal or tangential direction "because a more significant deformability of the sole in the horizontal direction would inevitably result in a floating effect." (JA01703(1:36-39)).

12

As the '866 Patent inventor recognized, the reason for that "floating effect" is that during running, the loads on the shoe change direction. First, the load is in the direction of arrow P1 as shown in Figure 1(b) above, which represents the load when contacting the ground (JA01705(5:65)). When the runner pushes off, however, the load on the shoe essentially reverses direction. Figure 1(c) of the '866 Patent illustrates this (along with the inventor's solution):



Fig 1c)

As Figure 1(c) shows, when the runner pushes off, the load on the shoe now is in the direction of arrow P2. (JA1704(3:51-53); JA1705(5:66)). As the inventor recognized, if athletic shoes available on the market permitted elastic deformation in the horizontal or tangential direction, then the deformation that occurred as a result of load P1 shown in Figure 1(b) when the shoe contacted the ground would lead to a deformation in the opposite direction when the load on the shoe reversed when the runner pushed off (as shown by arrow P2 in Figure 1(c)). As the inventor recognized, "[t]his would negatively influence the stability of the runner."

13

(JA01703(1:38-39)). Moreover, "the runner would lose at least a certain distance with each step because the sole would initially have to slightly deform in the respectively opposite direction when the runner pushes off in the running direction." (JA01703(1:39-43)).

### 3.  The Inventor's Solution

The '866 Patent inventor's solution to those problems was to provide an outsole that makes it possible to substantially eliminate the "floating effect" while at the same time permitting resiliency in the tangential direction. (JA01703(1:49-53)). To do so, he invented an outsole that could deform in the tangential direction, but then became rigid to further deformations beyond a critical point of deformation, regardless of the direction of stresses on the shoe. (JA01703(1:55-59)). His solution had two results – the outsole provided shock absorption if the runner's foot contacts the ground obliquely and/or with a slight propulsive force and it also provided superior stability at the point of impact, allowing the runner to push off again without any loss of distance. (JA01703(2:4-10)).

The '866 Patent describes one embodiment with respect to Figure 1. As shown in Figure 1(a), reproduced below, the outsole has a number of profile-like hollow elements (3) that contain tubular parts (3.1) fixed to the underside of the intermediate sole on the shoe. (JA01704(3:12-16)).

14



The hollow elements may be formed of a rubber material that is able to at least partially elastically deform under the loads that occur while running. (JA01704(3:17-18)).

When no loads are present, the outsole is configured so that the upper and lower portions of the resilient hollow elements (3.1.1 and 3.1.2 in Figure 3(a)) are spaced apart from each other. (JA01701).



When the shoe is subjected to a transversely forward load (such as in the direction of P1 in Figure 1(b)), the resilient elements elastically absorb the load by deformation in both the vertical and horizontal directions. (JA01704(3:33-34)). This is shown in Figures 1(b) and 3(b).



That is, as shown in Figure 1(b) and Figure 3(b), not only do the upper and lower portions of the resilient members of the outsole deform vertically, they also move relative to each other in the longitudinal direction in order to deform in the horizontal direction.

The outsole is further configured so that at some point in the deformation, the upper portion and lower portion of the hollow elements come into engagement with each other. (JA01704(3:29-37)). As described in the '866 Patent, this engagement can be either "frictional" (JA01704(3:34-36)) or "positive engagement" using, for example, toothing on the upper and lower portions, or a combination thereof. (JA01705(5:13-18)).

The outsole is configured so that as a result of the engagement of the upper and lower portions of the elastic member, there is such a high resistance to additional deformation that they can only be additionally deformed "to a negligible degree." (JA01705(3:39-41)). The outsole is thus configured such that as a result of the engagement of the upper and lower portions of the resilient element, "the

16

runner is in contact with the ground [ ] in such a way that a horizontal shift practically can no longer take place." (JA01705(3:42-45)). Further, as a result of that engagement, the runner is able to "push off" for the next step as shown in Figure 1(c) "without any loss in distance, namely because the previously described frictional engagement between the tubular parts 3.1 practically makes it impossible for these parts to horizontally deform to a noteworthy degree in the direction of the load that occurs while pushing off [arrow P2 in Figure 1(c)]." (JA01704(3:46-53)).

### 4.  The Pertinent Claim Limitations

The inventor's solution to the problems with existing athletic shoes are reflected in the pertinent claim limitations of the '866 Patent's independent claims. Claim 1 recites:

- "a resilient member" having upper and lower portions, and that has a first configuration and a second configuration. (JA01705(6:5-11)).

- In the first configuration, "the inner surface of the upper portion [is] spaced from the inner surface of the lower portion," and in that first configuration, "the resilient member elastically absorbs shoe loads oblique to the perpendicular direction *by relative motion in the longitudinal direction between the upper portion and the lower portion.*" (JA01705(6:10-16)).

17

- In the second configuration, "the inner surface of the upper portion [is] engaged with the inner surface of the lower portion," and "the engagement *substantially preventing relative motion in the longitudinal direction between the upper portion and the lower portion*." (JA01705(6:16-21)).

Claim 1 thus recites an outsole configured first to *allow* relative motion between the upper and lower portions of the resilient member so as to elastically absorb shoe load oblique to the perpendicular, and then to *substantially prevent* relative motion in the longitudinal direction between the upper and lower portions of the resilient member. Independent claim 9 has similar elements.

## B. Overview of the Cited References

### 1. Okabe

Okabe relates to a sole structure for footwear. In general, Okabe describes a sole structure having an outsole 2 that includes airtight cavities 6a and 6b located at the heel part and toe part of the sole (JA01751[0019] and [0024]), which serve to provide a cushioning effect. (JA01752[0027]). Okabe's structure is generally shown in Figure 1, reproduced below.



Okabe Fig. 1 (JA01752).

Okabe describes that when cavities are formed in shoe soles to provide air cushioning, "inadequate support in the horizontal direction produces a feeling of instability as if stepping on an air cushion."   (JA01750[0005-0006]). Okabe is silent on whether "inadequate support in the horizontal direction" refers to instability caused by relative movement of parts of the shoe in different directions, or simply "tilting" instability caused by standing on an air cushion.

To solve this purported problem, Okabe describes placing rubber pins 8 inside the airtight cavities. The rubber pins 8 are shown in Figures 3 and 4 of Okabe.



Okabe Fig. 3 (JA01752).



Okabe Fig. 4 (JA01752).

As Okabe describes, "[a]s shown in FIG. 3, when the load is small, the tops of the rubber pins 8 and the bottom surface of the midsole 3 are separated, and only the air cushion created by the air in the cavities works against the load. As shown in FIG. 4, when the bottom surface of the midsole 3 descends due to an increase in load and touches the tops of the rubber pins 8, the cushioning effect caused by the

elastic deformation of the midsole 3 and each of the rubber pins 8 works together with the air cushion effect, and the characteristic instability experienced with the air cushion effect alone is improved as a result." (JA01751[0022]).

As can be seen by comparing Okabe Figures 3 and 4 and from the description of the midsole "descending" to touch the tops of the rubber pins at JA01751[0022], Okabe describes only movement in the vertical direction, not relative motion in the horizontal direction between upper and lower portions of any resilient member. (*See* JA01752).

Furthermore, Okabe describes that the rubber pins 8 continually elastically deform under changing loads:

> [S]ince each rubber pin 8 has a circular truncated cone shape, the elastic deformation of the rubber pins 8 does not increase linearly in response to increases in load. In other words, when the load is small the top parts of the rubber pins 8 elastically deform and bear most of the load, and as the load increases, the bases of the rubber pins gradually begin to elastically deform, which makes it possible to maintain a reasonable level of cushioning to accommodate a wide spectrum of changes in load ranging from small to large loads.

(JA01751[0022]). Okabe is silent as to whether, in a configuration where an upper portion is in contact with a lower portion, relative longitudinal movement between the upper portion and the lower portion is substantially prevented. In fact, as will be explained in more detail below, Okabe's description that its rubber pins continuously elastically deform under varying loads shows that cannot be the case.

21

### 2. Szentes

Szentes relates to a footwear having a sole-part made of an elastic material, formed as a double layer. Between the two layers there is a space forming a cavity that is filled with a material the liquid phase. (JA01734[23-27]). Szentes describes that one of the layers has "guide ribs and notches … promoting and/or inhibiting the flow of the enclosed inflexible material of liquid phase." (JA01734[36]-01735[4]). Figure 2 of Szentes is reproduced below:



Szentes Fig. 2 (JA01745).

Like Okabe, Szentes describes that prior shoes having a cavity that serves as a cushion results in "walking becomes instable [sic.]" (JA01731[30-31]) and "wearing results in unsure and wobbling walk." (JA01732[2-3]). As with Okabe, Szentes is silent on whether this "instability" or "unsure and wobbling walk" refers

to instability caused by relative movement of parts of the shoe in different directions, or simply "tilting" instability caused by standing on an air cushion.

Szentes also describes a deficiency with other shoes "in so far as surficial parts of the two layers facing each other are sliding easily on one another on effect of sliding force components, as a consequence, the person using the footwear has the sen[s]e of uncertain[ ]ty." (JA01733[19-23]). Szentes describes that the result of this "sliding" is that "[c]onnection between the two layers having been fixed to each other gets torn after a short use, as the two layers lying on each other, sliding frequently and relatively to a large extent, are subjected to a considerable load, as a consequence glued material parts get torn apart." (JA01733[23-28]).

Szentes describes that one purpose of the ribs in Szentes's footwear "lies in to prevent sliding of the two layers on one another, when the upper layer 2 is lying onto the lower layer 3 in the loaded state, under the effect of the force component transferred by the foot from the upper layer 2, being parallel with the longitudinal direction or cross-direction of the shoe." (JA01738[23-29]). Otherwise, "[i]f along the periphery of the upper layer 2 and the lower layer 3 reinforcement, connection of the sole 1 of the footwear tore, cracked, slip may occur." (JA01738[29-32]).

While Szentes describes having ribs to "prevent" layers from sliding on one another, Szentes is silent on whether Szentes's footwear is configured to allow upper and lower portions to move longitudinally relative to each other when

spaced apart. Moreover, Szentes is silent on whether any such relative longitudinal motion "elastically absorbs shoe loads oblique to the perpendicular direction" as recited in the '866 Patent claims.

### 3. Pagani, Takahashi, and Inohara

Pagani, Takahashi, and Inohara, the subject of the obviousness rejections reversed by the Board, each show a plurality of hollow elements on the underside of a shoe sole to provide cushioning. (*See* JA01724[33-38]; JA01718-01719; JA01715(3:37-49)).



Pagani Fig. 1 (JA01723).                    Takahashi Fig. 1 (JA01720).



Inohara Fig. 13 (JA01713).

Pagani discloses a sole tread with ridges comprising a plurality of embossments 12 having both channels 11 and ground-engaging engaging edges 13

spanning the sole tread. (JA01723 and JA01725). Pagani states that this combination of structure improves "softness of the sole and its adherence to the ground." (JA01725). Pagani is silent as to how much the channels 11 themselves would collapse under a load, e.g., none, partially, fully, etc. Pagani is silent as to whether the channels 11 shift in a longitudinal (tangential) direction when a load is applied to the sole.

Takahashi discloses a shoe sole comprising a plurality of ***ridge bodies*** 7 containing passage holes 6 spanning the traverse direction of the sole and arranged either on the ball section and/or heel section of the shoe sole. (JA01718). Like Pagani, Takahashi is silent concerning the amount of a collapse of the ridge bodies 7, e.g. none, partial, or fully, when a load is applied to the sole. Moreover, Takahashi is silent concerning whether the ridge bodies shift in a longitudinal (tangential) direction when a load is applied to the sole.

Inohara discloses a sport shoe sole that has a rigid ground sole. (JA01706, (Abstract)). As shown in Figure 13, the heel portion of the sole has a plurality of apertures spanning transversely. (JA01716 (5:16-30)). Similar to Pagani and Takahashi, Inohara is silent concerning the amount of collapse of the apertures within heel section of the shoe sole. Moreover, Inohara is silent concerning whether the apertures shift longitudinally (tangentially) when a load is applied to the sole.

25

## IV.    SUMMARY OF THE ARGUMENT

Regarding the issues raised by On Clouds' cross-appeal, the Board erred in affirming the examiner's rejection of claims 1-5, 9, and 10 as anticipated by Okabe. While Okabe shows rubber pins that contact the bottom surface of Okabe's midsole, Okabe has no description regarding what happens when those pins are in contact with the midsole. As such, Okabe is silent as to whether when the pins engage the midsole, "the engagement substantially prevent[s] relative motion in the longitudinal direction between the upper portion and the lower portion, as recited in the '866 Patent claims. In fact, Okabe's description as to how its rubber pins continue to deform under changing loads shows that its structure could not "substantially prevent relative motion in the longitudinal direction." The Board's reliance on claim interpretation of the term "substantially" to distinguish the deformations in Okabe disregards both the '866 Patent specification and Okabe's disclosure. Contrary to the Board's view, Okabe's deformations are not "negligible or not "noteworthy." In Okabe, whatever longitudinal deformations that occur in order to absorb oblique shoe loads occur in the opposite direction when a runner pushes off. Therefore, Okabe's shoe would have the same "floating effect" the '866 Patent inventor recognized as a problem, and which the structure recited in the '866 Patent claims avoids.

26

The Board also erred in affirming the Examiner's rejection of Claims 1, 2, and 8-10 as anticipated by Szentes. Szentes is silent on whether its sole structure is configured so that an upper portion of a resilient member moves relative to a lower portion in the longitudinal direction when the inner surfaces of the upper portion and lower portion are spaced apart. Moreover, Szentes is likewise silent on whether any such relative longitudinal motion elastically absorbs oblique shoe loads. The Board's reasons for finding anticipation by Szentes are not supported by substantial evidence. Not only is the Board's analysis of Szentes contradicted by the disclosure of Szentes itself, under the Board's own reasoning, Szentes prevents relative movement in the longitudinal direction between the layers when Szentes's shoe is bearing weight. As a result, Szentes describes "preventing" relative movement at the only time when there would be oblique shoe loads.

Substantial evidence also does not support the Board's finding that claim 8 is anticipated by Szentes. Ribs formed "so as to fit into" notches does not describe "positive engagement" as that term was interpreted by the Board. The Board's reasoning that Szentes's disclosure "does not preclude" Szentes's structural features from interacting positively to engage each other is contrary to this Court's case law concerning inherent anticipation.

Regarding the issues raised by K-Swiss's appeal, substantial evidence supports the Board's decision to reverse the examiner's obviousness rejections. K-

Swiss makes essentially the same arguments concerning the proposed rejections over Pagani in view of Szentes, Takahashi in view of Szentes, and Inohara in view of Szentes. The Board carefully considered the evidence of record, including the references themselves and the statements of K-Swiss's declarant in making it findings concerning the facts underlying the obviousness determination. K-Swiss's appeal arguments simply disagree with the findings the Board made based upon its view of the evidence. As the Board correctly reasoned, the examiner used impermissible hindsight in making the rejections.  Substantial evidence supports that conclusion.

The Board also properly found that the examiner's rejection of claim 8 as anticipated by Okabe was erroneous. K-Swiss's arguments are based on interpreting "positive engagement" in light of Okabe, not in light of the '866 Patent specification. The Board properly interpreted "positive engagement," and substantial evidence supports the Board's analysis of K-Swiss's declaration and its determination that Okabe does not anticipate claim 8.

Finally, the Board properly found that the examiner's rejection of claim 11 as anticipated by Okabe was erroneous. K-Swiss's arguments are refuted by Okabe's disclosure itself, as the Board recognized.

## V.    ARGUMENT

### A. Standard of Review

#### 1. This Court May Reverse The Board's Decision Regarding The Anticipation Rejections If The Rejections Are Unsupported By Substantial Evidence

Anticipation is a question of fact. *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991). What a reference teaches is a question of fact. *Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995). This Court reviews factual findings of the Board for substantial evidence, based on a review that is "confined to the factual record compiled by the Board." *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000). "Under the substantial evidence standard of review, [the Court] search[es] for evidence, clearly set forth in the record below, to justify the conclusions that the Board has drawn." *Brand v. Miller*, 487 F.3d 862, 868 (Fed. Cir. 2007). This Court has also "expressly held that the Board's opinion must explicate its factual conclusions, enabling [the Court] to verify readily whether those conclusions are indeed supported by 'substantial evidence' contained within the record." *Gartside*, 203 F.3d at 1314 (citing *Gechter v. Davidson*, 116 F.3d 1454, 1460 (Fed. Cir. 1997)).

#### 2.  Claim Construction Is Reviewed de Novo

"Claim construction by the PTO is a question of law that [this Court] review[s] *de novo*." *In re Baker Hughes Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000). During reexamination proceedings, claims are given their broadest

reasonable interpretation consistent with the specification. *In re Yamamoto*, 740 F.2d 1569, 1571-72 (Fed. Cir. 1984); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).

### 3. The Board's Ultimate Conclusion Of Obviousness Is Reviewed de Novo, But The Underlying Factual Findings Are Reviewed For Substantial Evidence

"Obviousness is a question of law that [this Court] review[s] *de novo* with underlying factual findings." *In re NTP, Inc.*, 654 F.3d 1279, 1297 (Fed. Cir. 2011). The Board's underlying factual findings, however, are reviewed for substantial evidence. *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1378 (Fed. Cir. 2007) ("Although based on determinations of underlying facts, which we review for substantial evidence, the ultimate conclusion of obviousness is a legal question, which we review de novo.").

Further, if "the evidence in [the] record will support several reasonable but contradictory conclusions," then this Court "will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's finding from being supported by substantial evidence." *Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1361 (Fed. Cir. 2001).

## ISSUES RAISED BY ON CLOUDS' APPEAL

### B. The Board Erred In Affirming The Examiner's Rejection Of Claims 1-5, 9, And 10 As Anticipated By Okabe

The Board erred in affirming the Examiner's rejection of Claims 1-5, and 10 as anticipated by Okabe. While Okabe describes rubber pins that contact the bottom surface of the midsole, Okabe does not describe what happens when those pins are in contact with the midsole – *i.e.,* whether "the engagement substantially prevent[s] relative motion in the longitudinal direction between the upper portion and the lower portion" as the '866 Patent claims require. In fact, Okabe's description of the elasticity of the rubber pins shows that Okabe's structure *could not* "substantially prevent relative motion in the longitudinal direction." The Board's reliance on the term "substantially" in the claims is both contrary to the '866 Patent specification and in disregard of the disclosure of Okabe.

#### 1. Okabe Has No Express Disclosure That In A First Configuration, There Is Relative Motion In A Longitudinal Direction Between An Upper Portion And A Lower Portion Of A Resilient Member

As an initial matter, independent claim 1 requires a structure that in a first configuration, where "the inner surface of the upper portion [is] spaced from the inner surface of the lower portion," the resilient member "elastically absorbs shoe loads oblique to the perpendicular direction *by relative motion in the longitudinal direction between the upper portion and the lower portion.*"  (JA01705(6:10-16)).

31

Claim 9 has a similar limitation. (JA01705(6:50-56)). On its face, the disclosure of

Okabe describes and shows only movement in a vertical direction, *not* "relative

motion in the longitudinal direction."    As Okabe explains, when the load on the

shoe sole increases, Okabe's midsole 3 "descends" to touch the tops of rubber pins

8. (JA01751[0022]; *see also* JA00474, Board's Finding 2E). This is illustrated in

Okabe Figures 3 and 4:



Okabe Fig. 3 (JA01752).



Okabe Fig. 4 (JA01752).

There is no disclosure in Okabe that when the tops of Okabe's rubber pins 8 are spaced from the midsole 3, Okabe's structure is configured for "relative motion in the longitudinal direction between the upper portion and the lower portion" or that such relative motion elastically absorbs oblique shoe loads. Nevertheless, On Clouds has recognized Okabe's rubber pins 8 may be able to deform longitudinally as well as vertically; therefore, On Clouds does not dispute that Okabe may be able to elastically absorb shoe loads oblique to the perpendicular direction by relative motion in the longitudinal direction between the upper and lower portions. (*See* JA01262 (Response to Non-Final Office Action)). Nevertheless, as explained below, the same description of elastic deformation in Okabe that would support a finding that Okabe shows that oblique loads are absorbed by relative motion in the longitudinal direction also shows that the claim limitation "the engagement substantially prevent[s] relative motion in the longitudinal direction" is not met.

**2. Even Assuming Okabe Describes Relative Motion In A Longitudinal Direction, Okabe Has No Disclosure That In A Second Configuration Where The Inner Surfaces Of The Upper And Lower Portions Are Engaged, Relative Motion Between The Upper And Lower Portions Is Substantially Prevented**

Independent Claims 1 and 9 recite a resilient member having upper and lower portions so that in a configuration where "the inner surface of the upper portion engag[es] with the inner surface of the lower portion" "the engagement *substantially preventing relative motion in the longitudinal direction between the*

*upper portion and the lower portion*." (JA001705(6:16-21; 6:56-62). While Okabe

describes the tops of Okabe's rubber pins 8 contacting the midsole 3, Okabe is

silent on how the shoe structure behaves when the pins are in contact with the

midsole.



Okabe Fig. 4 (JA01752).

There is no express disclosure in Okabe that the engagement "substantially

prevent[s] relative motion in the longitudinal direction between the upper portion

and the lower portion," as the '866 Patent claims require. For instance, there is no

disclosure that the pins do not in fact "glide" along the midsole depending on

horizontal stresses, in which case there would in fact be "relative motion in the

longitudinal direction between the upper portion and the lower portion." While the

Board relies on Okabe's reference to earlier shoes having "inadequate support in

the horizontal direction produc[ing] a feeling of instability" (JA00474, citing

JA017590[0005]), Okabe's discussion of "instability" is ambiguous. Okabe is

silent on whether the "inadequate support in the horizontal direction" refers to instability caused by relative movement of parts of the shoe in different directions, or simply instability cause by "tilting" from side to side when standing on an air cushion.

Moreover, even assuming the top surface of Okabe's rubber pins 8 remains at the same point of contact with the midsole 3, Okabe's description of its rubber pins shows that relative movement between the upper and lower portions *is not* substantially prevented. Okabe describes that the rubber pins 8 continually elastically deform under changing loads:

> [S]ince each rubber pin 8 has a circular truncated cone shape, the elastic deformation of the rubber pins 8 does not increase linearly in response to increases in load. In other words, when the load is small the top parts of the rubber pins 8 elastically deform and bear most of the load, and *as the load increases, the bases of the rubber pins gradually begin to elastically deform, which makes it possible to maintain a reasonable level of cushioning to accommodate a wide spectrum of changes in load ranging from small to large loads*.

(JA01751[0022]). As that portion of Okabe explains, the rubber pins 8 maintain their elasticity under a wide spectrum of changing loads. As a result, the rubber pins 8 would continuously deform in response to changes in load.

Furthermore, Okabe's rubber pins apparently are not limited to deformation only in the vertical direction. If an oblique forward load were placed on Okabe's shoe, the rubber pins would deform both vertically and longitudinally, as even K-Swiss's expert acknowledged. (JA00851[60]). Deformation of Okabe's rubber pins

in the longitudinal direction causes relative motion between the upper and lower portions in the longitudinal direction, even when the tops of Okabe's rubber pins are in contact with the midsole. As a result, the claim limitation "the engagement *substantially preventing relative motion in the longitudinal direction between the upper portion and the lower portion*" is not met.

### 3. The Board's Reliance On The Term "Substantial" Disregards The '866 Patent Specification And Okabe's Description Of Its Rubber Pins

To avoid Okabe's description that its rubber pins continue to deform under varying loads (thus causing relative movement), the Board determined that any such deformation still resulted in "substantially" preventing relative movement so as to not be "noteworthy" because the additional deformation is "due to 'the remaining elasticity of the material, i.e., to a negligible degree.'" (JA00477, citing '866 Patent, JA01704(3:38-41)). That determination improperly disregards what is described in the '866 Patent specification and is contradicted by Okabe's description of its rubber pins.

Applying the "broadest reasonable interpretation" standard, the Board interpreted "relative motion in the longitudinal direction" as corresponding to "relative motion of non-negligible magnitude such as that which causes the 'floating effect' problem described in the specification of the '866 patent, but does not encompass small, relative motion of negligible magnitude that are not

'noteworthy.'" (JA00476). Furthermore, the Board noted that in the context of "substantial[ ]" prevention of relative motion, "the specification of the '866 patent makes clear that while the frictional engagement generates high resistance to additional deformation, a negligible degree of deformation can occur via 'the remaining elasticity of the material.'" (*Id.*) While those interpretations are consistent with the '866 Patent specification, the Board's application of those interpretations to Okabe is both inconsistent with what is described in the '866 Patent specification and inconsistent with the description of the deformations in Okabe.

As the '866 Patent describes, under a load applied to the shoe, the outsole structure is first configured to undergo "an initial elastic absorption of the load in the form of a vertical and horizontal deformation." (JA01704(3:33-34)). After that initial elastic absorption, the tubular parts of the outsole are "completely compressed." (JA01704(3:32-34)). The engagement between the upper and lower portions generates a high resistance to an "*additional* deformation" "that *they practically can only be **additionally** deformed by the remaining elasticity of the material, i.e., to a negligible degree*." (JA01074(3:36-40)). Thus, according to the '866 Patent specification, the "additional" deformation caused by "the remaining elasticity of the material" is "negligible" in comparison to the initial deformation that elastically absorbs the shoe loads.

37

Contrary to the Board's view, Okabe does not show "negligible" deformations or relative movement that is not "noteworthy," as those terms are used in the '866 Patent specification. As explained above, Okabe does not expressly disclose a resilient member that "elastically absorbs shoe loads oblique to the perpendicular direction by relative motion in the longitudinal direction" between the upper and lower portions of the resilient member. (*See supra*, page 31-33). In fact, the only description in Okabe of "elastic deformation" is when the tops of Okabe's rubber pins 8 contact the midsole 3:  "when the bottom surface of the midsole 3 descends due to an increase in load and touched the tops of the rubber pins 8, the cushioning effect caused by *the elastic deformation of the midsole 3 and each of the rubber pins 8* works together with the air cushion effect."  (JA01751). Therefore, the only description in Okabe that could support a finding that Okabe shows a resilient member that "elastically absorbs shoe loads oblique to the perpendicular direction" is the elastic deformation of the rubber pins 8 in conjunction with the midsole 3.

That contrasts with the '866 Patent specification, which describes a first elastic deformation to absorb shoe loads *before* the upper and lower portions of the resilient member contact each other. (JA01704(3:33-35)). In Okabe, in contrast to the structure described and claimed in the '866 Patent, there is no "additional" deformation that is merely negligible. Instead, the only description in Okabe of

elastic deformation that could absorb oblique shoe loads occurs through the rubber pins contacting the midsole. Therefore, the elastic deformation of the rubber pins in Okabe, which is the only deformation that could absorb oblique loads, is not "negligible" as that term is used in the '866 Patent.

Moreover, whatever relative motion occurs in the longitudinal direction in Okabe in order to elastically absorb oblique shoe loads would occur in reverse when the runner pushes off.



Okabe, therefore, would have precisely the same "floating effect" the '866 Patent describes as a problem with existing shoes and that the claimed invention

overcame. Even under the Board's interpretation of "relative motion in the longitudinal direction" as corresponding to relative motion of non-negligible effect "such as that which causes the 'floating effect' problem" (JA00476), Okabe does not meet the claim limitation that "the engagement of the upper and lower portions *substantially prevent[s] relative motion in the longitudinal direction between the upper portion and the lower portion*."

### 4. The Board's Finding Of Anticipation By Okabe Is Unsupported By Substantial Evidence

Substantial evidence does not support the Board's finding of anticipation by Okabe. Okabe has no express disclosure that oblique shoe loads are elastically absorbed through relative movement of upper and lower portions of a resilient member when the inner surface of the upper portion is spaced apart from the inner surface of the lower portion. Okabe has no express disclosure that relative movement in the longitudinal between the upper and lower portions of the resilient member are "substantially prevent[ed]" when Okabe's rubber pins are in contact with the midsole. As described above, Okabe's description of its elastic deformation shows that whatever relative longitudinal movement that occurs to "elastically absorb[ ]" oblique shoe loads would occur in reverse when the runner pushes off, giving rise to the same "floating effect" the structure recited in the claims seeks to avoid. Finally, the Board's application of the claim term "substantially preventing relative motion" is inconsistent with the description in

40

the '866 Patent specification and Okabe itself. Accordingly, the Board's finding of anticipation by Okabe is unsupported by substantial evidence.

### C. The Board Erred In Affirming The Examiner's Rejection Of Claims 1, 2, And 8-10 As Anticipated By Szentes

#### 1. Szentes Has No Disclosure That In A First Configuration, There Is Relative Motion In A Longitudinal Direction Between An Upper Portion And A Lower Portion Of A Resilient Member

Independent claim 1 requires a structure that in a first configuration where "the inner surface of the upper portion [is] spaced from the inner surface of the lower portion," the resilient member "*elastically absorbs shoe loads oblique to the perpendicular direction by relative motion in the longitudinal direction between the upper portion and the lower portion.*" (JA01705(6:10-16)). Claim 9 has a similar limitation. (JA01705(6:50-56)).

Nothing in Szentes describes that its sole structure is configured so that an upper portion of a resilient member moves relative to a lower portion in the longitudinal direction. In fact, Szentes's disclosure suggests just the opposite – Szentes attempts to avoid any relative horizontal movement between its upper and lower sole parts.

Szentes describes that prior shoes having a cavity that serves as a cushion results in "walking becomes instable [sic.]" (JA01731[30-31]) and "wearing results in unsure and wobbling walk." (JA01732[2-3]). Szentes also describes a deficiency with other shoes "in so far as surficial parts of the two layers facing

41

each other are sliding easily on one another on effect of sliding force components, as a consequence, the person using the footwear has the sen[s]e of uncertain[ ]ty." (JA01733[19-23]; see also K-Swiss Appellant's Brief at 16). Szentes refers to those characteristics of prior shoes as deficiencies, *not* that Szentes would incorporate those characteristics into its sole structure.

Furthermore, Szentes describes that in prior shoes, the result of two layers "sliding" on each other is that "[c]onnection between the two layers having been fixed to each other gets torn after a short use, as the two layers lying on each other, sliding frequently and relatively to a large extent, are subjected to a considerable load, as a consequence glued material parts get torn apart."  (JA01733[23-28]). Szentes describes that one purpose of the ribs in Szentes's footwear "lies in to prevent sliding of the two layers on one another, when the upper layer 2 is lying onto the lower layer 3 in the loaded state, under the effect of the force component transferred by the foot from the upper layer 2, being parallel with the longitudinal direction or cross-direction of the shoe."  (JA01738[23-29]). Otherwise, "[i]f along the periphery of the upper layer 2 and the lower layer 3 reinforcement, connection of the sole 1 of the footwear tore, cracked, slip may occur."  (JA01738[29-32]).

While Szentes describes problems with "glued material parts get torn apart" when "the two layer [are] lying on each other" (JA01733[23-28]), nothing in Szentes suggests that that problem is avoided when the two layers are not "lying on

42

each other." Simply put, there is no disclosure in Szentes that Szentes's structure allows *any* relative movement in the longitudinal direction between an upper portion and a lower portion. Moreover, even if there were such a disclosure, there is no disclosure that relative longitudinal movement "elastically absorbs shoe loads oblique to the perpendicular direction," as the claims recite.

## 2. The Board's Rationale For Anticipation Is Not Supported By Substantial Evidence

The Board's decision found On Clouds' arguments that Szentes lacks any disclosure of relative movement in the longitudinal direction "unpersuasive" because "it is this very relative motion that the provided notches and ribs of Szentes are designed to address when the shoe is in its loaded state." (JA00483). The Board's reasoning, however, disregards that a disclosure that the ribs are designed to prevent relative motion when the shoe is in the loaded state says nothing about what happens in the *unloaded* state. Szentes is silent on that point. Furthermore, even if the Board were correct that the notches and ribs of Szentes "are designed to address" relative motion, the Board's reasoning ignores that the claims are not simply directed to an outsole structure that is configured to allow relative movement in the longitudinal direction, the claims recite that that relative movement "elastically absorbs shoe loads oblique to the perpendicular." (JA01705(3:12-16) (claim 1); *see also* JA(01705(3:53-57) (claim 9)). Szentes is silent on that point as well.

43

The Board likewise stated that "[i]f there is no relative motion between the upper and lower layers, there would be no reason to provide such notches and ribs." (JA00483). That reasoning is not supported by Szentes. Szentes suggests that "[c]onnection between the two layers having been fixed to each other gets torn after a short use, as the two layers lying on each other, sliding frequently and relatively to a large extent, *are subjected to a considerable load*, as a consequence glued material parts get torn apart." (JA001733[23-28]). Szentes therefore describes that its ribs "prevent sliding of the two layers … *in the loaded state*." (JA001735[23-26]). Szentes's description of its ribs addresses the loaded state only, and states that the reason for providing ribs is to "prevent sliding of the two layers … *in the loaded state*." Szentes has no disclosure of any sliding or relative motion in the unloaded state. Indeed, the same concerns about "glued material parts get[ting] torn apart" would apply, regardless of whether the shoe was in its loaded or unloaded state.

Furthermore, the Board's statement that "[i]f there is no relative motion between the upper and lower layers, *there would be no reason to provide such notches and ribs*" (JA00483) is squarely contradicted by Szentes. Szentes describes that another reason to provide notches and ribs is that "with equal thickness of the sole 1 of the footwear a larger mass of liquid could be arranged in the cavity 4, as the notches 7 between the ribs 8 are also storing the liquid."

44

(JA01738[32-35]). Szentes also describes that "guide ribs and notches are formed promoting and/or inhibiting the flow of the enclosed inflexible material of liquid phase according to a predetermined systematical order." (JA01735[1-4]). Still further Szentes describes that "[e]xpediently skiving [i.e., forming thin layers] of the upper layer 2 on the aforementioned places can be realized by forming notches 7, next to the notches 7 ribs 8 are to be found." (JA01737[10-13]). Szentes's other stated reasons for providing notches and ribs show there is no support for the Board's reasoning that "[i]f there is no relative motion between the upper and lower layers, there would be no reason to provide such notches and ribs." (JA00483).

Finally, the Board reasoned that "the Patent Owner ignores the fact that the two layers of Szentes do not contact each other until the wearer's weight is applied to the sole of the shoe." (JA00483). The Board similarly stated "Szentes provides the notches and ribs for prevention of relative motion between the layers when the sole is bearing weight of the wearer, not when it is in an unloaded state." (*Id.*) On Clouds submits that those statements by the Board actually explain why Szentes's disclosure does not anticipate. According to the '866 Patent, when the shoe described in the patent "is subjected to a transversely forward load" there is "an initial elastic absorption of the load in the form of a vertical and horizontal deformation." (JA01704(3:29-34)). That description is reflected in the '866 Patent

45

claims. For example, claim 1 recites a structure configured to "elastically absorb[ ] shoe loads oblique to the perpendicular direction by relative motion in the longitudinal direction between the upper portion and the lower portion." (JA1705(6:101-16)). According to the Board's reasoning, however, "when the sole is bearing the weight of the wearer" – *i.e.*, when a load is applied to the shoe – "Szentes provides the notches and ribs for prevention of relative motion between the layers." (JA00483). Under the Board's own reasoning, the only disclosure in Szentes is that when a load is applied to the shoe, the two layers in Szentes contact each other, and the ribs prevent relative motion between the layers. Szentes therefore has no disclosure that relative motion between the layers occurs to elastically absorb oblique shoe loads.

### 3. Substantial Evidence Does Not Support The Board's Finding That Claim 8 Is Anticipated by Szentes

Claim 8 recites, "The outsole according to claim 1, wherein the engagement comprises positive engagement." As the Board correctly held in reversing the Examiner's rejection of claim 8 as anticipated by Okabe, "[t]he specification of the '866 patent clearly distinguishes 'frictional engagement' from 'positive engagement,' describing them as alternatives to each other which can also be provided in combination." (JA00478, referencing JA01705(5:13-17 and 24-26)). The Board determined that "the broadest reasonable construction of 'positive engagement' in view of the specification of the '866 patent is engagement

achieved through the interaction of structural features of the engaged components."

(JA00478).

To find that Szentes anticipates claim 8, however, the Board cited the

following passage from Szentes:

> In accordance with the invention, a further embodiment of the
> footwear can be characterized in that the ribs formed on one of the
> soles of the footwear are realized so as to fit into the notches.

(JA00484, citing Finding of Fact 3B; JA01735[32-35]).

Contrary to the Board's "broadest reasonable construction" of "positive

engagement," that description in Szentes says nothing about whether "engagement

[is] achieved through the interaction of structural features." Indeed, that sentence

(along with Szentes's claim 6) is the *only* reference in Szentes to ribs formed "so as

to fit into" the notches. There are no figures or any other description of ribs "fitting

into" notches, much less a description of "interaction of structural features" if ribs

were to fit into notches. Moreover, the isolated reference to ribs that "fit into"

notches contradicts the remaining disclosure of Szentes, which describes that a

purpose for the notches is to store the liquid that serves as a cushion. (JA01738[32-

35]).

Even if Szentes had some description as to what is meant by ribs formed "so

as to fit into" notches, there is no description as to whether so forming the ribs

would result in "interaction of structural features." For example, a narrow rib

could "fit into" a notch without any interaction with the sides of the notch that could achieve "positive engagement."

The Board's reasoning that "[t]he fact that the ribs and notches differ in size *does not preclude* these structural features from interacting to positively engage each other" (JA00484) is contrary to law. The issue is not whether "positive engagement" is "precluded" by Szentes, but whether Szentes expressly or inherently describes "positive engagement." "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991).

In order to be inherent, "positive engagement" must necessarily be present in Szentes – it is legally insufficient that Szentes simply "does not preclude" positive engagement. *See Akamai Techs., Inc. v. Cable & Wireless Internet Serv., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003) ("A claim limitation is inherent in the prior art if it is necessarily present in the prior art, not merely probably or possibly present."); *see Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991) (holding that under principles of inherency, when a reference is silent about an

asserted inherent characteristic, it must be clear that the missing descriptive matter is necessarily present in the thing described in the reference). *See also In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981) (quoting *Hansgirg v. Kemmer*, 102 F.2d 212, 214 (CCPA 1939)) (holding that "[i]nherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient."). "Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) (quoting *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)).

Szentes's description merely that the ribs on one sole may "fit into" notches on the other sole does not expressly or inherently meet the Board's interpretation of "positive engagement" as "engagement achieved through the interaction of structural features of the engaged components."  Therefore, substantial evidence does not support the Board's finding that claim 8 is anticipated by Szentes.

**ISSUES RAISED BY K-SWISS'S APPEAL**

**D. The Board Correctly Reversed the Examiner's Obviousness Rejections**

    **1. Substantial Evidence Supports The Board's Findings And Conclusions Of Law That Claims 1-11 Are Not Obvious Over Pagani In View Of Szentes**

Substantial evidence supports the Board's findings and conclusion of law that the Examiner erred in rejecting claims 1-11 over Pagani and Szentes. The Board provides numerous findings of fact concerning the teachings of Pagani (JA00485-00486), the teachings of Szentes (JA00480-00482), and the statements of the declarant Mr. Frederick (JA00486). Given those findings, the Board properly concluded that because "Pagani is silent as to any contact between the inner surfaces of the upper and lower portion, nor does Pagani discuss the extent of this movement [of the upper and lower portions toward each other]," it was speculative on the Examiner's part to posit "Pagani would necessarily be compressed to the extent wherein the upper and lower portions are 'engaged' as recited in claim 1." (JA00488). Thus, the Board correctly concluded that the only conclusion of obviousness of the claimed invention that could be drawn would be from impermissible hindsight:

> a fair reading of Szentes suggests not using a plurality of small channels such as that disclosed in Pagani, because Szentes disparages such a configuration (FF3H) [(JA00482, ¶FF3H (citing Szentes (JA01731[33-01732[3])). In this regard, rather than modifying the plurality of small channels in the sole of the prior art, Szentes suggests

using a single, large cavity in all of the different embodiments disclosed.

(JA00488). As noted by this Court's predecessor, it is necessary to properly construe what an applied reference *fairly* teaches or discloses. *See, e.g., In re Fracalossi and Wajer*, 681 F.2d 792 (CCPA 1982) (reference is prior art not only for specifically disclosed embodiments, but also all that it fairly teaches).

### a. The Board Correctly Determined That Even If A Claim Might Be Anticipated, That Does Not Necessarily Render It Obvious

K-Swiss argues that the Board should have found the claims obvious over Pagani in view of Szentes because, according to K-Swiss, "anticipation is the epitome of obviousness." For the reasons explained above, however, Szentes does not anticipate, and so K-Swiss's reliance on the "epitome" language is misplaced. Moreover, the Board was correct to conclude that a claim is non-obvious even though the claim might be anticipated. The doctrine of anticipation asks whether all elements are within a single piece of prior art. The doctrine of obviousness asks whether given the scope and content of the prior art, the differences between the prior art and claimed invention, the level of ordinary skill in the art, and, when in evidence, secondary considerations, the claimed invention as a whole would have been obvious at the time of invention was made to a person having ordinary skill in the art.

There is no requirement that a finding of anticipation regarding one reference compels a determination that those claims are rendered obvious over a combination of references because anticipation and obviousness each requires a separate analysis. *See Cohesive Tech. v. Waters Corp.*, 543 F.3d 1351, 1364 (Fed. Cir. 2008) ("While it is commonly understood that prior art references anticipate a claim will usually render that claim obvious, it is not necessarily true that a verdict of nonobviousness forecloses anticipation. *The tests for anticipation and obviousness are different.*"). While K-Swiss relies on statements that anticipation is supposedly "the epitome of obviousness," the Federal Circuit's decision in *Cohesive Tech.* refutes that argument:

> This is precisely why our precedent has rejected reliance on the "legal homily" that "anticipation is the epitome of obviousness." We have expressly upheld a jury verdict of anticipation under § 102(b), even when the same jury found the patent nonobvious under § 103. Though the dissent argues that a "long line of precedent" supports its argument that every anticipated claim is obvious, *not a single one of the cases it cites actually holds that the "epitome" maxim precludes a jury from finding a patent invalid under §102, simply because it is nonobvious under § 103.*

*Cohesive Tech.*, 543 F.3d at 1364 n.2 (*citing Mendenhall v. Cedarapids, Inc.*, 5. F.3d 1557, 1563 (Fed. Cir. 1993) (emphasis added). The Federal Circuit provided an example of a claim directed to an alloy of metal, which, while anticipated because a centuries-old alchemy textbook describes a process by which it is made, is nevertheless nonobvious because of such factors as long felt but unresolved need

for the alloy, unsuccessful efforts by others, and high praise for and commercial success of the alloy. *Id.*

K-Swiss's citations to legal authority concerning the rubrics of the "epitome of obviousness is anticipation" and "analogous art" cloud the true issue: whether substantial evidence supports the Board's findings of fact and conclusion of law that the Examiner erred in rejecting the claims as obvious.

### b. The Board Properly Concluded Impermissible Hindsight Was Used To Combine Pagani and Szentes In The Manner That The Examiner Maintained

K-Swiss fails to provide persuasive evidence to demonstrate that the Board's factual findings are not supported by substantial evidence. Mere disagreement with the Board's factual findings and citations to legal authority respectfully are not persuasive evidence. The Board disagreed with K-Swiss that there was a reason with rational underpinnings to combine the teachings of Pagani and Szentes. After thorough fact finding, the Board determined Szentes disparages using small channels such as those disclosed in Pagani, given the evidence and argument presented by all parties.

The Board fully addressed K-Swiss's argument about what Pagani recognizes as a problem and what Szentes teaches as improvements in footwear. (App. Br. 38-39). Given its findings, the Board concluded that Szentes disparaged the use of small channels like those shown in Pagani. (JA00488). K-Swiss provides

no evidence other than what the Board has already reviewed and rejected in its detailed findings of fact supporting its conclusion. If "the evidence in [the] record will support several reasonable but contradictory conclusions," then this Court "will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d at 1320. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's finding from being supported by substantial evidence." *Hoover*, 238 F.3d at 1361.

Furthermore, K-Swiss's arguments concerning what Pagani describes fail to demonstrate that the Board's factual findings lack substantial evidence. (App. Br. 39-40). The Board's findings concerning Pagani comport with how the Board understood Pagani. (JA00486 (¶4D)). Therefore, since both K-Swiss and the Board appear to agree on Pagani's disclosure, it is only K-Swiss's disagreement with the conclusion that is at issue. As noted above, disagreement is insufficient to demonstrate a lack of substantial evidence.

K-Swiss's apparent reason to combine is conclusory. (App. Br. 40). K-Swiss fails to marshal sufficient evidence from the record to disturb the Board's conclusion that the error of the Examiner was in using impermissible hindsight to reject the claimed invention as obvious over Pagani and Szentes.

### c. K-Swiss Mischaracterizes The Board's Position Concerning Pagani Collapsibility And Misapprehends The Board's Position Regarding An "Implied Limitation" In The Claims

K-Swiss argues the Board's Decision should be read as the Board apparently requiring the channels in Pagani to completely collapse in order to provide a reason with rational underpinnings to combine the teachings of Pagani and Szentes. (App. Br. 40). However, K-Swiss is mistaken and fails to cite to anywhere in the Board's decision for such a proposition. The Board stated that "Pagani is silent as to any contact between the inner surfaces of the upper and lower portions" (JA00488) and "[i]t is not apparent to us that the channels of Pagani would necessarily be compressed to the extent wherein the upper and lower portions are 'engaged' as recited in claim 1." (*Id.*) Thus, under the Board's view, there is insufficient evidence, i.e. it was "factually problematic," to establish by a preponderance of the evidence that Pagani's channels would compress to the extent necessary to satisfy the claim element reciting that the inner surfaces of the upper and lower portions are engaged. (JA00488). Again, K-Swiss merely recites the same set of facts that the Board had before it and considered in order to make its factual findings concerning Szentes and Pagani. (App. Br. 40). Instead, K-Swiss disagrees with the Board's outcome, but simply disagreeing with the outcome is insufficient to establish the Board's findings are not supported by substantial evidence. *Hoover*, 238 F.3d at 1361. Moreover, K-Swiss's insistence that the Board required

"complete[] collapse … to provide an apparent reason for modifying Pagani with Szentes" mischaracterizes the Board's position. The Board simply found that Pagani was silent about whether the channels of Pagani would compress to as to cause contact of the inner surfaces of the upper and lower portions.  That silence was "factually problematic" and thus there lacked sufficient evidence to find that Pagani's channels would necessarily compress so as to meet the elements of claim 1. (JA00488). K-Swiss fails to provide where in Szentes exists the "apparent reason" to "modify[ ] Pagani with Szentes."  (App. Br. 41). After review of all the findings of fact, the Board found that "Szentes disparages [] a configuration" disclosed in Pagani. (JA00488). K-Swiss has the burden to show that the Board here committed reversible error in finding Szentes disparages the configuration disclosed in Pagani, and K-Swiss has failed to provide sufficient evidence to counter that finding of fact. . *See In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004).

Furthermore, K-Swiss overstated the Board's opinion when arguing the Board "construed independent claims 1 and 9 to include an 'implied limitation.'" (App. Br. 41 citing (JA00489)). Rather, the Board was explaining that the K-Swiss's declarant's statement was "conclusory and unsubstantiated by persuasive evidence" with respect to Pagani's structure under "sufficiently large" loads.  As the Board correctly reasoned, "the subject matter of the claims and the prior art are

soles of shoes." (JA00489). The Board was properly construing the claimed subject matter under the broadest reasonable interpretation that would be consistent with the specification as it would be understood by one of ordinary skill in the art. *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d at 1364. The Board then reviewed Pagani to determine what Pagani fairly teaches or discloses, *see, e.g., In re Fracalossi and Wajer*, 681 F.2d 792 (CCPA 1982), in order for the Board to properly address the ground of rejection. *Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003) ("Both anticipation under § 102 and obviousness under § 103 are two-step inquiries. The first step in both analyses is a proper construction of the claims . . . . The second step in the analyses requires a comparison of the properly construed claim to the prior art." (internal citations omitted)). The Board reviewed all of the evidence and concluded that because the silence in Pagani concerning contact between the upper and lower inner surfaces was "factually problematic," a preponderance of the evidence did not demonstrate that the engagement as called for in claim 1 was met.

The Board found that the statements of K-Swiss's declarant "conclusory and unsubstantiated by persuasive objective evidence" (JA00489), not, as K-Swiss contends, that the purported implied limitation as K-Swiss argues was not addressed by the declarant. (App. Br. 42). The block quotation that K-Swiss contends is "replete with references to the subject matter of the claims and the

prior art soles of shoes" (*id.*) is no more than the declarant's opinion as to what the declarant has read. The declarant could have performed tests on Pagani's shoes in order to support his opinions concerning Pagani's disclosure. As the Board recognized, he did not do so; therefore, his statements were not supported by "persuasive objective evidence." Moreover, K-Swiss fails to provide a correlation exists between its declarant's reliance on what is disclosed in Inohara and the shoe described in Pagani, much less "persuasive objective evidence" that the Board found missing from the declaration. (App. Br. 43). The Board was correct to determine the declarant statements were not substantiated by objective evidence, and K-Swiss cannot show that finding is unsupported by substantial evidence.

### d. The Board Correctly Determined Szentes Disparages The Use Of Pagani's Small Channels

The Board concluded, based on all of its findings of fact, Szentes disparages small channels such as those disclosed in Pagani. While K-Swiss argues that footwear including a resilient member comprising a hollow element including a tubular part is "ready for an improvement" and it would be a simple substitution of applying one known element for another, K-Swiss fails to provide from this record, evidence that this prior art was ready for improvement or it would be a simple substitution. (App. Br. 44). Evidence demonstrating that the prior art was ready for improvement or that what K-Swiss proposes would be a simple substitution needs

to exist in the record on review. No such evidence is present in the record before this Court.

While K-Swiss alleges Szentes's discussion of footwear shown in yet another reference (Sakutori) supports an obviousness determination, K-Swiss fails to provide any analysis how such a discussion supports obviousness. (App. Br. 45). The Board's decision, on the other hand, enumerated a set of factual findings and analyzes those facts to conclude that the claimed invention would not be obviousness given the totality of the evidence before it. (JA00485-00486; JA00488-00489).

K-Swiss's argument that "[a] person having ordinary skill in the art could easily adjust the size of the ribs or teeth shown in Szentes to be suitable for use in the smaller channels of Pagani" (App. Br. 47) is no more than attorney argument since K-Swiss fails to provide sufficient evidence from the record to support such a statement. Appellants' attorney's arguments in a brief do not take the place of evidence in the record. *See In re Pearson*, 494 F.2d 1399, 1405 (CCPA 1974); *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984); *Meitzner v. Mindick*, 549 F.2d 775, 782 (CCPA 1977); *and In re Schulze*, 346 F.2d 600, 602 (CCPA 1965).

K-Swiss's attempt to compare the disclosures of Szentes and the '866 patent in order to argue that the Board erred in concluding, based on the disclosure of Szentes, Szentes disparages having small channels (App. Br. 48) avoids the

fundamental issue of whether Pagani and Szentes render obvious the claimed invention. The *Graham* factors include the differences between the claimed invention and the prior art; not the likenesses between disclosures of a piece of prior art and the claimed invention's disclosure. Given the scope and content of the art, differences between the claim and the prior art, the level of skill, and indicia of secondary considerations, the Board concluded the claimed invention was not rendered obviousness by Pagani and Szentes, i.e. "to add the notches and/or ribs of Szentes to the footwear of Pagani" as K-Swiss argues. (App. Br. 48).

### e. The Board Correctly Reversed The Examiner's Obviousness Rejections Of Claims 2-7 And 10 Over Pagani And Szentes

Because the Board correctly determined that independent claims 1 and 9 were not rendered obvious over Pagani and Szented, dependent claims 2-7 and 10 (which each incorporate all the limitations of either claim 1 or claim 9) are likely non-obvious, regardless of whether On Clouds has separately argued their patentability.

Regarding dependent claims 6 and 7, K-Swiss argues that those claims "merely recite specific percentage amounts of deformation." K-Swiss goes on to refer to Szentes (alone) in suggesting that "it is not inventive to discover the optimum or workable ranges." Nevertheless, during the reexamination, the Examiner *did not adopt* K-Swiss's proposed rejections of claims 6 and 7 as anticipated by Szentes. (JA01450-01452; JA00672-00674).    K-Swiss ***did not***

*appeal* that decision by the Examiner to the Board. Therefore, K-Swiss has waived any argument that Szentes alone renders claims 6 and 7 unpatentable.

### f.  The Board Properly Reversed The Obviousness Rejection Of Claim 11

Because claim 11 ultimately depends from claim1 and incorporates all the limitations of claim 1, the Board's decision that claim 1 is not obvious over Pagani in view of Szentes means that claim 11 as well is not obvious over Pagani in view of Szentes. To the extent K-Swiss's arguments are directed to Szentes alone (App. Br. 50), those arguments are addressed below regarding whether Szentes anticipates claim 11. Dependent claim 11 ultimately depends from claim 1. K-Swiss's argument to support its position that the Board erred in reversing the Examiner can be summarized as all of the elements are individually known in the prior art and thus it would be obvious to combine them in the manner claimed. (App. Br. 50-51).

### g.  The Board Should Be Permitted To Consider On Clouds' Declarations In The First Instance

The Board did not reach K-Swiss's arguments that On Clouds' declarations had no probative value, finding those argument "moot" in view of its decision that the claims were not obvious over Pagani in view of Szentes. To the extent the Court determines the claims may be obvious, the reexamination proceedings

should be remanded to the Board so that the Board may have the opportunity to evaluate the probative value of the declarations in the first instance.

### 2. Substantial Evidence Supports The Board's Findings And Conclusions Of Law That Claims 1-11 Are Not Obvious Over Takahashi In View Of Szentes

The Board determined that the same deficiencies with the combined teachings of Pagani and Szentes applied to the combined teachings of Takahashi and Szentes. (JA00490-00491). K-Swiss appears to argue the same reasoning it argued concerning the combination Pagani and Szentes as to why the Board erred concerning this ground of rejection. App. Br. 55-56. On Clouds incorporates by reference its reasoning above with respect to the combined teachings of Pagani and Szentes (*see* pages 50-61) that it presented to explain that K-Swiss has not established that substantial evidence does not support the Board's findings of fact and conclusions of law concerning the nonobviousness of claims 1-11.

### 3. Substantial Evidence Supports The Board's Findings And Conclusions Of Law That Claims 1-11 Are Not Obvious Over Inohara In View Of Szentes

The Board determined that the same deficiencies with the combined teachings of Pagani and Szentes applied to the combined teachings of Inohara and Szentes. (JA00491-00492). K-Swiss appears to argue the same reasoning it argued concerning the combination Pagani and Szentes as to why the Board erred concerning this ground of rejection. App. Br. 56-58. On Clouds incorporates by

reference its reasoning above with respect to the combined teachings of Pagani and Szentes (*see* pages 50-61) that it presented to explain that K-Swiss has not established that substantial evidence does not support the Board's findings of fact and conclusions of law concerning the nonobviousness of claims 1-11.

### E. The Board Properly Found That The Examiner's Rejection Of Claim 8 Based On Okabe Was Erroneous

Dependent claim 8 recites "[T]he outsole according to claim 1, wherein the engagement comprises positive engagement." The Board's Decision provided the proper interpretation of "positive engagement" under the "broadest reasonable interpretation," in light of the specification. As the Board reasoned, the '866 Patent "clearly distinguishes 'frictional engagement' from 'positive engagement,' describing them as alternatives to each other which can also be provided in combination." (JA00478, citing JA01705(5:13-17, 24-26)). Therefore, according to the Board, "the broadest reasonable construction of 'positive engagement' in view of the specification of the '866 patent is engagement achieved through the interaction of structural features of the engaged components." (Id.)

The Board's Decision properly determined the broadest reasonable interpretation of "positive engagement" and applied that interpretation to determine whether Okabe shows "positive engagement." Substantial evidence supports the Board's finding that the examiner's rejection of claim 8 as anticipated by Okabe was erroneous. The examiner, like K-Swiss here (App. Br. 58-59), essentially

interpreted the claim in light of the prior art, rather than use the broadest reasonable interpretation in light of the specification to determine whether Okabe described "positive engagement."

K-Swiss's error is evident in the manner in which it has presented its argument. First, K-Swiss discusses what its declarant stated. (App. Br. 58). Next, K-Swiss compares a figure of the '866 patent to a figure from Okabe. (App. Br. 59). Only then does K-Swiss refer to the Board's broadest reasonable construction, but K-Swiss's arguments are, in effect, that because the Board found Okabe does not show "positive engagement," then the Board's claim interpretation must have been wrong. (See App. Br. 59). The Board's decision, however, applies the proper test for anticipation: A determination of anticipation or obviousness begins with claim construction, followed by a comparison of the construed claim to the prior art. Key Pharm. v. Hercon Labs. Corp., 161 F.3d 709, 714 (Fed. Cir. 1998).

Here, the Board provided a clear and distinct analysis of how to construe the claim limitation "positive engagement" in light of the specification as it would be understood by a person having ordinary skill in the art. The Board reviewed the '866 patent's specification, provided its findings of fact, and analyzed the findings. (JA00461-00464; JA00478-00479). Based on its review of the record the Board concluded the broadest reasonable interpretation of "positive engagement" was such engagement "achieved through the interaction of structural features of the

engaged components." (JA00478). Contrary to K-Swiss's arguments (App. Br. 59 (emphasis omitted)), the Board did not construe the term "to require the exact preformed interlocking toothing arrangement (on both upper and lower surfaces) shown in Fig. 7" of the '866 Patent. Nor did the Board "interpret[ ] the claims as limited to the particular embodiments appearing in the written description." (App. Br. 60).

Instead, applying its "broadest reasonable interpretation," the Board found that Okabe's structures did not satisfy this limitation because while Okabe's pins 8 and sole 3 may deform upon application of a load, "the sole 3 is planar in its construction and does not include any structural features that interact with rubber pins 8 in a manner that can reasonably be characterized as 'positive engagement.'" (JA00479). Essentially, both the examiner's and K-Swiss's interpretation of "positive engagement" to read on Okabe would render the limitation meaningless. This Court disfavors any claim interpretation which would render a claim term superfluous . Stumbo v. Eastman Outdoors, Inc., 508 F.3d 1358, 1362 (Fed. Cir. 2007).

The fallacy of K-Swiss's position is evident in how K-Swiss tries to persuade this Court that the Board committed error. K-Swiss compares the prior art figures to the '866 patent's figures to argue the two disclose the same thing. However, "it is well established that patent drawings do not define the precise

proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue." Hockerson-Halberstadt, Inc. v. Avia Group Int'l, 222 F.3d 951, 956 (Fed. Cir. 2000). Indeed, the Okabe drawings themselves only show the tops of the pins 8 engaging with a planar sole 3 (see JA01752), consistent with the Board's finding. Okabe fails to fully articulate what actually occurs when a load is applied to its depicted shoe sole. References are evaluated and applied on the basis of what they reasonably disclose and suggest to a person skilled in the art. In re Aslanian, 590 F.2d 911, 914 (CCPA 1979) (citing In re Baum, 374 F.2d 1004, 1009 (1967)). The Board was correct in not resorting to speculation as to what Okabe describes.

The Board likewise correctly found the opinions of K-Swiss's declarant unpersuasive. K-Swiss's declarant failed to support his opinion with any evaluation of the actual Okabe shoe disclosed within Okabe or any test on a sample that represents what Okabe discloses as a shoe sole. As the Board correctly reasoned (JA00479), "any indentation formed on the sole 3 is merely the elastic compression thereof, and while frictional engagement between the sole 3 and the rubber pins 8 can be characterized as having been increased by such elastic compression, such engagement cannot [ ] reasonably be characterized as positive engagement." Even if K-Swiss's declarant were correct that there is some sort of indentation formed on the sole, there is no evidence that there is any interaction between that

"indentation" and the rubber pins, other than frictional engagement at the top surface of the pins.

While On Clouds agrees that multiple types of engagement are permitted by claim 8 (App. Br. 62), one of those multiple types of engagements needs to be a positive engagement, as recited in the claim. The Board correctly found that Okabe failed to disclose such an engagement and therefore failed to anticipate claim 8, and K-Swiss has not shown that finding is not supported by substantial evidence.

### F. The Board Properly Found That The Examiner's Anticipation Rejection Of Claim 11 Based On Okabe Was Erroneous

The Board's decision properly provided the broadest reasonable interpretation of the claim limitation "tubular part." Further, substantial evidence supports the Board's finding that the examiner's rejection of claim 11 as anticipated by Okabe was erroneous.

K-Swiss appears to argue that the Board construed "tubular part" as some specific shape described in the specification. (App. Br. 64). Contrary' to K-Swiss's arguments, the Board explained that claim 3 is directed to the number of resilient members (a plurality), while claim 11 is directed to the shape of an individual resilient member . (JA00472).

The Board did not err in finding that Okabe did not disclose a resilient member comprising a profile like hollow element that contains a tubular part as called for in claim 11 because the Board aptly noted that Okabe's Figure 1 is

"merely a cross-sectional view" (JA00480), and the shape of the Okabe's cavity is shown in Figure 2, which depicts that cavity as sealed to the outside environment. (*See* JA01752). As Okabe describes, the cavities K-Swiss relies on are actually "independent airtight cavities … formed between roughly elliptical shaped recessed parts. … established on the upper surface of the outsole 2 and the lower surface of the midsole 3." (JA01751[0022]). Claim 11, by its plain language, requires the resilient member to be hollow and tubular, both terms denoting a structure with open ends where the length of the structure is of greater dimension than the width. Moreover, as the Board recognized, Okabe's Figure 2, in conjunction with Okabe's discussion of that Figure, makes clear that the cavities are "planar." (JA00480). Okabe's structure fails to meet the elements of claim 11, since Okabe's cavity is sealed from the environment and cannot be reasonably thought of as having a length of greater dimension that the width. Thus the Board was correct to find that Okabe failed to satisfy what was called for in claim 11. K-Swiss arguments that Okabe discloses narrow cavities (App. Br. 65) should be discounted since K-Swiss can only cite to one prophetic sentence that appears inconsistent with the rest of Okabe's disclosure and figures.

## VI.    **CONCLUSION**

For these reasons, On Clouds respectfully requests that the Court:

- Reverse the Board's decision affirming the Examiner's rejection of claims 1-5, 9, and 10 as anticipated by Okabe;

- Reverse the Board's decision affirming the Examiner's rejection of claims 1, 2, and 8-10 as anticipated by Szentes

and

- Affirm the Board's decision reversing the Examiner's rejection of claims 1-11 over Pagani, Takahashi, or Inohara in view of Szentes; and

- Affirm the Board's decision reversing the Examiner's rejection of claims 8 and 11 as anticipated by Okabe.

Dated: August 26, 2013                    Respectfully submitted,

/s/ Henry A. Petri, Jr.
Henry A. Petri
Michael W. O'Neill
Daniel P. Mullarkey
NOVAK DRUCE CONNOLLY BOVE +
QUIGG LLP
1875 Eye Street, NW
Eleventh Floor
Washington, DC 20006
(202) 331-7111

*Attorneys for Appellee/Cross-Appellant*

# United States Court of Appeals
## for the Federal Circuit
### *K-SWISS INC. v. GLIDE'N LOCK GMBH, 2013-1316, -1317*

## CERTIFICATE OF SERVICE

I certify that on **August 26, 2013**, the foregoing **Brief for Appellee/Cross Appellant** was filed with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

> Steven P. Weihrouch, I
> Jeffrey R. Fougere
> Jennifer Nock
> Rothwell, Figg, Ernst & Manbeck, P.C.
> Suite 800
> 607 14th Street, NW
> Washington, DC 20005
> 202-783-5690
> sweihrouch@rfem.com
> jfougere@rothwellfigg.com
> jnock@rfem.com

Additionally, two paper copies will also be serviced by mailed to the above counsel via Priority Mail when the paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

August 26, 2013                                    /s/ Henry A. Petri, Jr.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains    14,178    words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

     The brief uses a monospaced typeface and contains     lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2007 in a 14 point Times New Roman font or

     The brief has been prepared in a monospaced typeface using MS      in a     characters per inch     font.


  August 26, 2013               /s/ Henry A. Petri       
                                     Attorney for Cross Appellant